Pope v. Jenkins.

POPE *et al.*, BY THEIR GUARDIAN, Appellants, v. JENKINS, Respondent.

1. One P., in Kentucky, in the year 1843, being insolvent, mortgaged his property, including a slave named Ellen, to secure certain liabilities. No proceedings to foreclose the mortgage were instituted, but the mortgagees set up the property for sale at public auction, P. being present and consenting to the course pursued. The mortgagees purchased the slave Ellen at this sale, took and kept possession of her for two years and then sold her to one M. for a full price. M. gave said Ellen to the children of P. in 1846, and executed a deed to them in 1850, which was duly recorded in Kentucky. In 1851 P. moved with his family to Missouri, and in the same year sold said slave to one J. *Held*, in a suit for the possession of said slave and her increase, brought by the children of P. against said J., that, whether P.'s equity of redemption was extinguished or not by the sale by the mortgagees in Kentucky, the legal title was in the plaintiffs; that such equity of redemption, if unextinguished, did not stand in the way of a recovery by plaintiffs, the defendant not wishing to redeem.

2. In actions for the possession of personal property, the plaintiff, if he succeed, has the choice of taking the property or its value. By the value of the property is meant its value at the time of its valuation by the jury. If slaves, for example, are sued for, and they die in the hands of the defendant during suit, the plaintiff has no just claim for more than damages for their detention up to the time of their death. If the depreciation in value or death be produced by ill-treatment or neglect, or the slaves be sold to another, the rule may be different.

*Appeal from Platte Circuit Court.*

This suit was commenced March 5, 1856. The facts in evidence sufficiently appear in the opinion of the court.

Plaintiff asked the court to instruct the jury as follows: "1. Before the defendant can set up any claim to the negroes, he must show that he is a purchaser from Cyrus Miller, the donor, or from the children, his donees. 2. If the jury find from the evidence that Miller was an innocent purchaser of said slave Ellen from Bruce, Fisher, and others, for a valuable consideration—took said negroes into his possession and kept them some time, and then in 1846 gave said negroes into the possession of the children of Alamander and Mary Ann Pope, plaintiffs as aforesaid, and that the children have ever since retained the possession of the same under the

gift aforesaid, then they will find for the plaintiff. 3. If the jury believe from the evidence that Alamander Pope, the father of these children, mortgaged said negroes, and that said negroes were sold under said mortgage to Bruce and Fisher and others by the knowledge and consent of Pope; that Miller afterwards purchased from them for a valuable consideration and gave said slave to the plaintiffs, and evidenced said gift by deed acknowledged and recorded as the laws of Kentucky require, then the title vests in the children, and Alamander Pope, or Jenkins claiming under him, are estopped from saying that no title passed to said children. 4. If Alamander Pope mortgaged said negroes to Bruce, Fisher and others, and said negroes were sold under said mortgage with his knowledge and consent, then said Pope, or Jenkins, claiming under him, are estopped from saying that no title passed from the mortgagor. 5. If Miller, at the time of the gift, delivered the possession of said slaves to the children of Alamander and Mary Ann Pope, and that said children lived with their father under his control, and were so living at the time defendant purchased from the said Pope, then the possession of the father was the possession of the childen, and the law presumes that Jenkins purchased with notice; and unless he shows he purchased from Miller or the children of Pope, he acquires no title, nor had Alamander Pope any title or right to convey the same or any interest therein. 6. If the jury believe from the evidence that Miller was an innocent purchaser for a valuable consideration of said negro; that he gave said negro and gave them the possession thereof, then it is immaterial whether Pope at the time of the mortgage contemplated a fraud or not, and Jenkins, his assignee, acquired no title to the property in question. 7. The answer admits that the slaves bought by Jenkins are the same sued for and described in plaintiff's said petition. 8. The answer admits the appointment of Moore as guardian, and his substitution as one of the plaintiffs in this cause. 9. If the jury find for plaintiff, they will also find the value of the negroes without taking into consideration

the death of either of them.   10. That the certificate of the clerk endorsed on the deed of gift from Cyrus Miller to the children is evidence, or evidence that it was recorded as therein stated.   11. If the jury find for plaintiff, they will find the value of the slaves now living."   Of these instructions, the court gave those numbered seven, eight, ten and eleven, and refused the others.

The court, of its own motion, gave the following instructions : " 1. If the jury believe from the evidence that the negro Ellen was conveyed by deed of mortgage to Henry Bruce, William Bruce, Richard Fisher, and Jachaar P. Fisher, by Alamander Pope, and that subsequently thereto the negro was sold by the mortgagees at public sale with Pope's consent, and that at such sale the negro was bought by the mortgagees, then such sale is void as to a subsequent purchase from Pope without notice ; and unless they believe that defendant purchased of said Pope with such notice, they will find for defendant.   2. If the jury believe from the evidence that the negro Ellen was conveyed by deed of mortgage as above, and that subsequently thereto the negro was sold at public sale by said Pope, with the consent of the said mortgagees, [and they] became the purchasers for a valuable consideration, the sale was valid ; and if they believe Miller purchased from them and by deed of gift gave the negroes to plaintiff and delivered the possession of the negro at the time, they will find for plaintiff."

*Vories, Hall & Spratt*, for appellants.

I. The court erred in permitting the defendant to file supplemental answers.   The court erred in giving and refusing instructions.   The sale by the mortgagees was, under the circumstances, a good and valid transfer of the property in the slave.   Miller assigned a good title to the slave.   (11 Mo. 555.)   The plaintiff's title is therefore good.   The court erred in its ruling as to the measure of damages.   The defendant gave bond.   He retained them at his peril, and is responsible for them or their value.

*Woodson*, for respondent.

I. Under the law of Kentucky the sale to the mortgagees was invalid. (1 Monr. 44 ; 3 Litt. 410 ; 5 Litt. 202 ; 9 Dana, 190 ; 6 Dana, 474 ; 12 Mo. 106 ; 1 Mor. & Brown's Dig. 449.) Defendant was an innocent purchaser. The plaintiffs were not entitled to recover the price of the dead slaves in any case. (R. C. 1855, p. 1243 ; 13 Mo. 612 ; 24 Mo. 269 ; 25 Mo. 301.)

NAPTON, Judge, delivered the opinion of the court.

This suit was brought by the children of Alamander Pope, through their guardian, to recover several slaves sold to the defendant by their father. The defendant gave bond as required by the statute, and retained possession of the slaves. During the pendency of the suit three of the slaves died, and this fact was brought to the attention of the court in a supplemental answer filed by the defendant.

It appears, from the evidence preserved at the trial, that Alamander Pope, in 1843, lived in Boyle county, Kentucky ; that at this time he was hopelessly insolvent, and in order to secure certain of his friends, who had become his securities to a large amount, he had executed a mortgage of his land and slaves, and perhaps all his property, including a negro woman named Ellen, who was the ancestress of the slaves now in controversy. As the mortgaged property was believed to be insufficient to pay the mortgage debt, no proceedings to foreclose were instituted, but the mortgagees, to save expense, as they alleged, set up the property at public auction, Pope being present and consenting to the course pursued. The negro woman Ellen was purchased by the mortgagees at this sale, taken into possession for two years, and then sold to Cyrus Miller, a brother-in-law of Pope, for a full price. Miller gave the woman to the children of Pope in 1846 and executed a deed to the children in 1850, which was duly acknowledged and recorded according to the law of Kentucky. In 1851 Pope and his family removed to this state,

and the defendant's title is derived from a sale made to him by Pope.

We do not conceive it necessary to allude to the instructions in detail which the court gave the jury on the trial of this case. It will be seen, upon an examination of them, that the case was made to turn principally upon the validity of the sale made by the mortgagees in 1843. The jury were instructed, that if the sale was made by the mortgagees with Pope's consent, it was void so far as the defendant purchasing from Pope without notice was concerned; but if the sale was made by Pope with the consent of the mortgagees, the sale was good, and the plaintiffs must recover. We confess ourselves unable to appreciate the distinction which these instructions attempted between a sale by the mortgagees with Pope's consent and a sale by Pope with the mortgagees' consent. We do not perceive how a sale by the owner of an equity of redemption, (which equity was in this case, as it is proved, of no value whatever,) with the assent of the owners of the legal title, could be any more available to pass the title than a sale by the legal owners, with the assent of the person having an equity of redemption. The instructions appear to have been based upon a statute of Kentucky, passed in 1820, which declared all sales by trustees under deeds of trust or pledge of any estate to be invalid unless made under the decree of some court of chancery, upon proceedings had thereon as in the case of mortgages, or unless the makers of the deed or pledge joined in the deed or writing evidencing the sale. (Ky. Dig., Morehead, Feb. 11, 1820.) This act is evidently intended for deeds of trust, and such other conveyances in pledge as, previously to its passage, would have authorized the trustees to make a sale and pass a title to the property pledged without the interposition of any legal proceedings. It has no application to mortgages, which contained in the deed no power of sale in the mortgagees, and which, by the principles of the common law, and without reference to this act, required a regular foreclosure to extinguish the equity of redemption of the mortgagor.

This question, however, in relation to the validity of the sale made by the mortgagees, upon which the merits of the case were made to turn upon the trial, was not, in our view of the case, anywise material to its proper determination. Admitting the sale to have been irregular and invalid, how is this circumstance to affect the title of the plaintiffs or the defendant? The invalidity of the sale in 1843 by the mortgagees certainly does not put the title in Pope. It only amounts to this, that the equity of redemption was not extinguished. The legal title was still in the mortgagees, and they conveyed it to Miller, and Miller conveyed it to Pope's children, the plaintiffs in this case. The Kentucky statute was certainly not intended to impair the right of a mortgagee to transfer his legal estate; it merely provided against the extinction of an equity of redemption, unless one of the two modes pointed out in the act was pursued. It was for the benefit of *cestuis que trust*, but was not designed to make trust estates inalienable.

There is no dispute about the validity of the mortgage in 1843. There was a transfer of possession as well as of title from Pope at that time, and from that time until his attempted sale to the defendant in this state in 1851 he was put in possession of the slave Ellen or her descendants. It is true that, upon Miller's conveyance and transfer of possession in 1845 or 1846 to his children, Pope, as their natural guardian, had such possession as the title warranted; but such a possession was not adverse to the title of the children, but in conformity to it. His possession was theirs, and however long continued, it would give no title. It was not until his sale to the defendant that he could be regarded as asserting an adverse possession. At least, we have no evidence of any previous act of adverse possession. Here was then a lapse of eight years during which there was an adverse possession against his equity of redemption. Admitting, however, that adverse possession for five years would not in general give title against an equity of redemption, it is, to say the least, doubtful whether a court of equity would allow it to be

asserted under the circumstances of this case. Pope was present when the mortgaged property was put up at auction; he undoubtedly assented to the sale, although he did not, as the Kentucky statute in reference to deeds of trust requires, join in the deed or writing which was the evidence of the transfer given to the purchasers by the mortgagees. Pope's equity was in truth a merely nominal one, a barren one, if we take the facts to be as they appear from the bill of exceptions. Would a court of equity permit him, under such circumstances, and after such a lapse of time, to assert his equity of redemption? Miller supposed himself to be buying the absolute title, both legal and equitable, and the mortgagees supposed themselves to be selling the absolute title, for they had previously, as they thought, extinguished the equity of redemption. Would not a court of equity, then, regard Pope as using the mortgagees as his agents to sell whatever title he had? A man of full age and sound mind may waive formalities, which the law allows him for his protection and not as a means of committing fraud upon others.

But the question whether Pope's equity of redemption was lost by his conduct at the sale by the mortgagees, by lapse of time, or by all the circumstances attending the transaction taken together, is not at all, so far as the evidence shows, of any materiality in the decision of this case. It is not pretended that Pope, or his assignee, the defendant, wishes to redeem this property by paying off the debts it was mortgaged to secure. The legal title is alone in controversy, and that, according to any view of the case, appears to be plainly in the plaintiff.

We have assumed the transactions referred to in this opinion as having been throughout *bona fide*. No fraud was suggested, and no instructions were asked raising any point of this kind.

In relation to the death of three of the slaves sued for, which occurred after the institution of the suit and was suggested by supplemental answer, the question presented is not

free from difficulty and doubt, and, it must be confessed, has been very differently viewed by different courts. Our opinion, however, will be based principally upon our statute, which regulates the action brought in this case, and upon what we believe to be principles of sound public policy and natural equity.

This subject was discussed many years ago by the court of appeals of Virginia in the case of Austin's Executor v. Jones, Gilmer, 341; but the court was divided and the point not determined. Judge Roane placed his opinion upon very narrow and technical grounds, but Judge Coalter took the position, which we find subsequently adopted by Judge Garston, of North Carolina, in a very able and elaborate opinion; (Bethen v. McLennon, 1 Ired. 531;) and the views of Judge Garston and Judge Coalter commend themselves to our judgment as most applicable in the construction of our statute concerning suits for the recovery of specific property, and entirely consonant with the claims of equity and public policy.

Before the adoption of our present code of practice, which abolishes the forms and names of actions as known to the common law, there was a distinction between detinue and trover, although, in many cases, it was at the option of the plaintiff to bring whichever he preferred. In trover the plaintiff admitted the title to the property sued for to be in the defendant, and only asked damages for the conversion, which he asserted was wrongful. In detinue the plaintiff claimed to be the owner still, and demanded the specific property detained. As the act of God does an injury to no one, though it may occasion a loss, the loss, of course, falls upon the owner, and, therefore, where detinue was brought and an accidental loss occurred by the death of the property sued for, it must fall upon the plaintiff if determined to be the owner. But it was otherwise in trover, where the plaintiff admitted the change of title, and only claimed damages for its conversion; there the loss would be the defendant's,

upon the same principle that it would be the plaintiff's in detinue.

In detinue the value of the property at the time of the assessment was the amount for which the defendant was responsible, if the property itself was not produced. The injustice of a contrary rule was strikingly illustrated by Judge Garston, by supposing a protracted litigation for a negro child, who, at the termination of the suit, has grown up to manhood. The injustice of substituting for the slave his value when a child would be apparent. So it would be equally unjust to require the defendant to pay the value of a slave who died during the progress of a suit. The learned judge very forcibly illustrates the impolicy of such a doctrine as applied to slaves. " It is not undeserving of consideration," says Judge Garston, " that, in many cases, actions of detinue are brought to try some of the most difficult questions of title to slaves, and when both parties are equally conscientious in asserting a claim thereto. If, in all cases, the holder is not only to be liable, in the event of failure, for hire, whilst they are in his possession, but also to be insurer of their lives, we drive him to the often inhuman alternative of making the most of them by sale instead of keeping them to abide the fair result of the contest. In this case it would be manifestly unjust, because of a mere mistake of title, to make him responsible for an act of Providence, which no prudence could avert, and which would probably have occurred had the possession been with his adversary. It is enough that, using the property humanely and prudently, he account for the use of it, and deliver it up, if it exist, when the controversy is decided against him."

When there is culpable neglect, or the death is produced by ill-treatment, or the slaves are sold to another for full value, the rule may be different.

In the case of Suydam v. Jenkins, 3 Sandf. Sup. C., we find a very learned disquisition upon this subject, leading to conclusions quite the opposite to those reached in the cases

we have just adverted to.   But we think the difficulties suggested by Judge Duer in the way of the rule for which we have intimated our preference might be obviated by allowing the jury, in the form of damages, to estimate the depreciation of property occasioned by its detention by the defendant. The question to be determined here is, not as to the measure of damages, but as to the value of the property.   Our statute gives to the party succeeding the choice of taking the property or its value.   These terms are understood therefore to be equivalent; but they would not be so, if, by the value of the property, is meant its value three years perhaps before its assessment, or any other period during which the litigation has been progressing.   We understand it to be the value of the property at the time of its valuation by the jury.   If the property sued for be slaves, and they are dead, they are of no value ; and if the death has been accidental, there is no just claim on the part of the owner for any thing more than damages for their detention up to the time of their death. If the death or depreciation in value be occasioned by the act or culpable negligence of the defendant, or he has, after giving bond for their forthcoming to answer the judgment of the court, disposed of them to another, the question is materially varied.   We confine ourselves to the case before us, in which the death is averred to have been an act of Providence, and no question was made, so far as we have observed, that such was not the case in fact.

The judgment is reversed and the case remanded.   The other judges concur.